FILED

08/11/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0613

DA 25-0613

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 190N

LYNNETTE KATHRYN SIMS,

      Petitioner and Appellee,

  v.

JUSTIN VERMACE,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DR-24-591
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Bryan Charles Tipp, Makayla M. White, Tipp Coburn Lockwood, P.C., Missoula, Montana

      For Appellee:

      Carolyn Gibadlo, Judnich Law Office, Missoula, Montana

Submitted on Briefs: June 24, 2026

Decided:  August 11, 2026

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1      Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent.  Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2      Justin Vermace (Vermace) appeals from the Second Order Amending Order of Protection entered in the Fourth Judicial District Court, Missoula County, on July 30, 2025. We affirm.

¶3      This matter stems from a property-line dispute in a rural area between Vermace and his neighbor, Lynnette Sims (Sims).  Vermace and his wife moved next door to Sims in early 2019.  At the time, Sims was renting her home out to tenants.  Around 2023, Sims began living full-time in her home adjacent to Vermace's home.  She soon noticed that Vermace had installed a gate on her side of the parties' property line.  Vermace explained that he believed the gate was located on his property based on his research on Montana Cadastral.  Sims offered to share the costs of a survey of the property line to settle the dispute, but Vermace refused.  In March 2024 while Sims was having her property surveyed, Vermace approached Sims and the surveyor with his dog who was acting aggressively.  Vermace appeared agitated and questioned why Sims needed a survey done and whether she intended to install a fence on the property line.  In April 2024, Vermace confronted a fencing crew that Sims had brought out to install a fence and told them that they were trespassing.  After the survey of Sims's property was completed in May 2024,

2

Sims offered to put Vermace in contact with the surveyor if he had any questions about the metes and bounds of Sims's property line. The survey confirmed that Vermace's truck, the gate, and a garden fence were encroaching onto Sims's property. Sims asked Vermace to remove his truck and said that she would allow more time to remove the garden fence. Sims cut the lock to the gate encroaching upon her property. Vermace replaced the lock with a thicker chain.

¶4 On May 29, 2024, Sims brought a friend out to help install a towing sign by the disputed area. Sims explained that she was fearful of Vermace and wanted to have a male companion present. It was dusk and Vermace confronted Sims and her friend while shining a flashlight at them, obscuring their view, and swore at Sims repeatedly. The friend took a video of Vermace being confrontational and testified that he felt very intimidated by Vermace's actions. Sims reported the incident to the sheriff's office, who sent out a deputy to speak with Vermace. Sims reviewed trail camera footage from later that night which showed Vermace approaching the property line holding a pistol in his right hand and a flashlight in his left hand. A sheriff's deputy trespassed Vermace off Sims's property in early July 2024.

¶5 The parties' property line dispute escalated to abrasive interactions on their shared private road. Vermace followed Sims in his truck, parked, and then watched her for some time. Sims turned off the road to calm herself down and then heard Vermace's truck peel off. Another neighbor testified that she observed Vermace's truck parked at the end of Sims's driveway. The neighbor believed it was odd to see a vehicle parked like that on a quiet, private road.

3

¶6 Sims filed for and obtained a temporary order of protection (TOP) in justice court. In August 2024, the District Court sua sponte requested that the TOP matter be transferred to the District Court given that there was pending civil litigation between the parties and a related criminal proceeding. For reasons not relevant on appeal, a hearing was continued multiple times. In March 2024, Sims advised the District Court that the parties had settled their civil dispute and the pending criminal charge against Vermace had been dismissed, permitting him to testify in his defense without risking self-incrimination. Vermace later moved the court to amend the TOP to be mutual between the parties and require that they refrain from going within 100 feet of each other's residences. The District Court held a hearing on March 28, 2025, wherein Sims, Vermace, Vermace's wife, and four other neighbors testified.

¶7 At the hearing the District Court found a sufficient basis for a five-year order of protection (OOP). The District Court found that the only area of confrontation was the property line and possibly the road, and instructed the parties that, "[i]f you happen to inadvertently see one another [on the road], just move on." In seeking to tailor a protective order given the circumstances, the District Court worked through various scenarios where the parties might need to be near the property line for maintenance purposes and ordered that the first party working near the property line would get priority and the other would have to wait to approach the property line until the work was completed within a reasonable amount of time. The District Court anticipated that the contours of the OOP may need to be refined and explained that neither party was prevented from seeking to amend the OOP based on good cause once the parties had more time to consider the OOP. Neither party

4

objected to this procedure for amending the OOP. The District Court orally pronounced that Vermace was prohibited from being within 20 feet of the property line with a firearm or when Sims was within 20 feet of the property line and indicated the prohibition of firearms near the property line would apply to both parties. The court instructed Sims's attorney to draft a proposed order and share it with Vermace.

¶8 On May 15, 2025, the District Court issued Sims's Proposed OOP. Vermace filed a Motion to Reconsider the same day asking the court to reconsider the OOP because its scope was broader than the District Court's oral pronouncement. It appears that Sims was never served with this motion. On June 26, 2025, the District Court granted in part Vermace's motion. The court clarified that the OOP applies only when the other party is present and within 20 feet of the property line, added a mutual requirement that neither party come within 20 feet of the property line with a firearm, and added provisions that Vermace complete violence counseling and refrain from taking photographs of Sims while she is on her property.

¶9 Sims moved to amend the OOP under M. R. Civ. P. 59(e) to rectify the court's provision that the prohibition near the property line was mutually effective upon the parties. Sims also requested that the court increase the distance which Vermace must keep from her and add specific language regarding the shared road. The District Court granted Sims's motion and amended Condition (m) to provide:

> [Vermace] is prohibited from being within 100 feet from [Sims], unless he is on his property or on Spring Hill Road. When on his property, [Vermace] must either be 100 feet from [Sims] or inside his residence. When on Spring Hill Road, [Vermace] must stay 100 feet away from [Sims], unless he needs to pass [Sims] while she is walking on the road, in which case he must drive

5

on the opposite side of the road as far as reasonably possible, only as necessary, and at a safe speed.

The court further amended Condition (n) to provide:

The Order of Protection shall say [Vermace] shall not carry a firearm within 100 feet of the fence line between [address omitted] and [address omitted]. [Vermace] may keep firearms in his residence. If [Vermace] needs to transport firearms off his property, he must remove them through the back door, walk them directly to his vehicle, and leave without delay.

In her motion, Sims alleged that, less than a week after the hearing, Vermace trailed Sims in his truck by less than two feet for approximately an eighth of a mile. Sims also alleged that, a few days after the District Court initially amended the OOP, Vermace followed Sims in his truck as she walked her dog, parked, and watched Sims for a period of time, before speeding past her vehicle, turning around, and driving past Sims within a few feet of her at approximately 50 miles per hour. Vermace opposed Sims's motion and denied the allegations therein but noted that he was defending a misdemeanor criminal charge for violating the OOP in connection with the latter incident alleged by Sims. The District Court granted Sims's motion and amended the OOP. Vermace now appeals the amended OOP.

¶10 "We will not overturn a district court's decision to continue, amend, or make permanent an order of protection absent an abuse of discretion." *Bardsley v. Pluger*, 2015 MT 301, ¶ 9, 381 Mont. 284, 358 P.3d 907. A district court abuses its discretion where it acts without employment of conscientious judgment, arbitrarily, or in excess of the bounds of reason resulting in a substantial injustice. *Bardsley*, ¶ 10. "Our review of

whether a party was afforded due process is plenary." *In re Est. of Boland*, 2019 MT 236, ¶ 18, 397 Mont. 319, 450 P.3d 849.

¶11 On appeal, Vermace argues that the District Court erred in amending the OOP because it based its decision on new, disputed allegations on which he had no opportunity to be heard. Vermace further avers that the statutory OOP framework and this Court's precedent require a hearing to amend an OOP, his due process rights required a hearing, and that a Rule 59 motion cannot expand an OOP based on disputed events which occurred after the relevant hearing. Sims responds that Vermace initiated the very process he now attacks on appeal, which he failed to object to below; the statutory OOP framework only requires a hearing to amend a TOP; this Court's precedent requiring an amendment to an OOP is distinguishable from the instant case; and any Rule 59 error was harmless because the District Court could amend the OOP upon good cause.

¶12 A person may file a petition for a TOP when they are in reasonable apprehension of bodily injury. Section 40-15-102(1), MCA. The court then must conduct a hearing within 20 days from the date it issues a TOP. Section 40-15-202(1), MCA. Section 40-15-204(1), MCA, provides that a "court may, on the basis of the respondent's history of violence, the severity of the offense at issue, and the evidence presented at the hearing, determine that to avoid further injury or harm, the petitioner needs permanent protection." Courts have the authority to direct the respondent to stay 1,500 feet or another appropriate distance away from the petitioner, his or her residence, school, workplace, or any specified place frequented by the petitioner as well as to complete violence counseling. Section 40-15-201(2), MCA. A court may only amend an OOP in writing, and the

7

amendment is only effective after it has been served in writing on the opposing party. Section 40-15-204(7), (9), MCA. An OOP "may not be made mutually effective by the court." Section 40-15-202(3), MCA.

¶13 "It has long been the rule of this Court that on appeal we will not put a District Court in error for a ruling or procedure in which the appellant acquiesced, participated, or to which appellant made no objection." *Green v. Green*, 176 Mont. 532, 536, 579 P.2d 1235, 1237 (1978) (collecting cases). In *Bardsley*, we held that it "is a manifest abuse of discretion for a court to issue a permanent order of protection without first conducting the statutorily mandated hearing." *Bardsley*, ¶ 15. There, the district court issued an OOP covering a neighbor and after a hearing on a preliminary injunction amended the OOP to include the neighbor's domestic partner and her family from using a disputed roadway. *Bardsley*, ¶ 6. The neighbor's domestic partner did not attend the hearing on a preliminary injunction and had no notice that she would need to mount a legal defense against an OOP. *Bardsley*, ¶ 16.

¶14 Here, Vermace failed to object to the District Court's procedure for tailoring the OOP to the parties' circumstances after the hearing and the District Court heard substantial credible evidence in support of its amendments to the OOP. Several times Vermace confronted Sims while she was near the property line, including at dusk when he swore at her multiple times and intimidated both her and a male companion. Vermace revisited the area later that night armed with a pistol and facing toward Sims's property. Vermace had earlier confronted Sims at the property line when she was having a survey done, the purpose of which was to clarify where the property line lay between the parties. Vermace then

confronted Sims's fencing crew. The District Court heard credible evidence that the parties' dispute had spilled out into the road on at least two occasions. Vermace followed Sims in his truck, parked and observed her for some time, and then sped away. A neighbor observed Vermace parked at the end of Sims's driveway appearing to be watching for Sims. The District Court's amendment to Condition (m) concerning the road is merely clarification of its oral pronouncement that, "[i]f you happen to inadvertently see one another [on the road], just move on." The District Court acted within its statutory authority when it ordered Vermace to stay 100 feet away from Sims or within his residence, that he is forbidden from bringing a firearm within 100 feet of the property line, and that he must complete violence counseling.

¶15   The facts here are readily distinguishable from those in *Bardsley*. There, the district court expanded an OOP to cover a new party who had no notice that she would need to defend against an OOP. *Bardsley*, ¶ 16. Here, in contrast, Vermace had notice that he would need to mount a legal defense to an OOP and appeared at a hearing where he did so. Before the hearing he moved the District Court to make the OOP mutual. Vermace then failed to object to the District Court's procedure of amending the OOP after the hearing, once the parties had more time to consider how best to tailor the OOP to their circumstances. The District Court did not violate Vermace's due process rights because it held a hearing before issuing the OOP and Vermace failed to object to the court's procedure for amending the OOP after the hearing. We will not fault a party for engaging in a procedure in which the parties acquiesced. *Green*, 176 Mont. at 536, 579 P.2d at 1237. Any error in considering Sims's motion to amend under Rule 59 beyond rectifying the

9

improper mutually effective provision is harmless because the District Court heard substantial credible evidence in support of the amended OOP, the District Court acted within its statutory authority, and Vermace never objected to the post-hearing amendment procedure. Accordingly, the District Court did not abuse its discretion when it issued the amended OOP.

¶16 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶17 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JIM RICE